UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Michael A. Hammer |
| v. | : | Mag. No. 15-4126 (MAH) |
| NILESHKUMAR PATEL and HARSAD MEHTA | : | **CRIMINAL COMPLAINT** |

I, Douglas E. Doherty, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

I further state that I am a Special Agent for the Department of Homeland Security, Homeland Security Investigations, and that this complaint is based upon the following facts:

SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

Douglas E. Doherty, Special Agent
Homeland Security Investigations

Sworn to before me and subscribed in my presence,

August 13, 2015                    at    Newark, New Jersey
Date                                      City and State

Honorable Michael A. Hammer
United States Magistrate Judge
Name & Title of Judicial Officer          Signature of Judicial Officer

1

## ATTACHMENT A

### COUNT 1

**Conspiracy to Bring In and Harbor Aliens**

From at least in or about June 2013, through and including in or about at least October 2014, in the District of New Jersey and elsewhere, defendants

**NILESHKUMAR PATEL
and HARSAD MEHTA**

knowingly and intentionally conspired and agreed with each other and others, for purposes of financial gain to, encourage and induce aliens, as that term is defined in Title 8, United States Code, Section 1101(a)(3), to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, or residence was or would be in violation of law, as described in Attachment B below, contrary to Title 8, United States Code, Section 1324(a)(1)(A)(iv) and Section 1324(a)(1)(B)(i)

In furtherance of the conspiracy and to effect its unlawful objects, the above-listed defendants and their co-conspirators committed and caused to be committed the overt acts, among others, in the District of New Jersey and elsewhere, as set forth in Attachment B below, in violation of Title 18, United States Code, Section 371 et seq.

## COUNT 2

**Smuggling Alien into the United States for Private Financial Gain**

From at least in or about June 2013, through and including in or about July 2014, in the District of New Jersey and elsewhere, defendants

**NILESHKUMAR PATEL
and HARSAD MEHTA**

knowingly and in reckless disregard of the fact that an alien, to wit, Individual A, had not received prior official authorization to come to, enter, and reside in the United States, did bring and attempt to bring to the United States said alien, for the purpose of commercial advantage and private financial gain.

In violation of Title 8, United States Code, Sections 1324(a)(2) and 1324(a)(2)(B)(ii), and Title 18, United States Code, Section 2.

## COUNT 3

### Smuggling Alien into the United States for Private Financial Gain

From at least in or about June 2013, through and including in or about July 2014, in the District of New Jersey and elsewhere, defendants

**NILESHKUMAR PATEL
and HARSAD MEHTA**

knowingly and in reckless disregard of the fact that an alien, to wit, Individual B, had not received prior official authorization to come to, enter, and reside in the United States, did bring and attempt to bring to the United States said alien, for the purpose of commercial advantage and private financial gain.

In violation of Title 8, United States Code, Sections 1324(a)(2) and 1324(a)(2)(B)(ii), and Title 18, United States Code, Section 2.

## COUNT 4

### Smuggling Alien into the United States for Private Financial Gain

From at least in or about August 2014, through and including in or about October 2014, in the District of New Jersey and elsewhere, defendants

**NILESHKUMAR PATEL
and HARSAD MEHTA**

knowingly and in reckless disregard of the fact that an alien, to wit, Individual C, had not received prior official authorization to come to, enter, and reside in the United States, did bring and attempt to bring to the United States said alien, for the purpose of commercial advantage and private financial gain.

In violation of Title 8, United States Code, Sections 1324(a)(2) and 1324(a)(2)(B)(ii), and Title 18, United States Code, Section 2.

## COUNT 5

**Smuggling Alien into the United States for Private Financial Gain**

From at least in or about August 2014, through and including in or about October 2014, in the District of New Jersey and elsewhere, defendants

**NILESHKUMAR PATEL
and HARSAD MEHTA**

knowingly and in reckless disregard of the fact that an alien, to wit, Individual D, had not received prior official authorization to come to, enter, and reside in the United States, did bring and attempt to bring to the United States said alien, for the purpose of commercial advantage and private financial gain.

In violation of Title 8, United States Code, Sections 1324(a)(2) and 1324(a)(2)(B)(ii), and Title 18, United States Code, Section 2.

## COUNT 6

### Smuggling Alien into the United States for Private Financial Gain

From at least in or about December 2014, through and including in or about January 2015, in the District of New Jersey and elsewhere, defendant

### NILESHKUMAR PATEL

knowingly and in reckless disregard of the fact that an alien, to wit, Individual E, had not received prior official authorization to come to, enter, and reside in the United States, did bring and attempt to bring to the United States said alien, for the purpose of commercial advantage and private financial gain.

In violation of Title 8, United States Code, Sections 1324(a)(2) and 1324(a)(2)(B)(ii), and Title 18, United States Code, Section 2.

## COUNT 7

### Smuggling Alien into the United States for Private Financial Gain

From at least in or about December 2014, through and including in or about January 2015, in the District of New Jersey and elsewhere, defendant

### NILESHKUMAR PATEL

knowingly and in reckless disregard of the fact that an alien, to wit, Individual F, had not received prior official authorization to come to, enter, and reside in the United States, did bring and attempt to bring to the United States said alien, for the purpose of commercial advantage and private financial gain.

In violation of Title 8, United States Code, Sections 1324(a)(2) and 1324(a)(2)(B)(ii), and Title 18, United States Code, Section 2.

## ATTACHMENT B

I, Douglas E. Doherty, being duly sworn, depose and say:

1. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI") and have been since 2009. My experience as a Special Agent has included the investigation of cases involving immigration violations and alien smuggling. I have received training and have gained experience in interview and interrogation techniques, arrest procedures, obtaining electronically stored information through criminal process, search warrant applications, and the execution of searches and seizures. I have also received training and information, and gained experience concerning alien smuggling crimes, as well as the tactics, techniques, and procedures used by alien smugglers to evade detection. The information contained in this affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers and witnesses, and the review of documents and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause for a criminal complaint, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for a criminal complaint. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part. Dates of events in this affidavit are asserted as having occurred on or about the asserted date.

## Summary of Investigation

2. An ongoing investigation conducted by HSI has revealed that an alien smuggling organization ("ASO") was attempting to find methods to illegally smuggle aliens from India into the United States.

3. The investigation revealed that the ASO recruits Indian nationals and others to pay fees to the ASO in exchange for passage to the United States. In most cases, the Indian nationals are smuggled into the United States via way points in the Far East, Central America, South America, and/or Canada. Once the aliens arrive at these foreign way points, the ASO makes arrangements to move the aliens into the United States via land, sea, or air routes.

4. Beginning in 2013, HSI began utilizing an undercover law enforcement officer ("UC") to infiltrate the ASO run by defendants NILESHKUMAR PATEL ("NILESH") and HARSAD MEHTA ("HARRY"). Investigative efforts by the UC and other law enforcement officers to date have resulted in the controlled entry of six aliens into the United States, by what NILESH and/or HARRY believed to be illegal means.

## Probable Cause

### The First Alien Smuggling Operation

5.  Beginning in June 2013, NILESH began contacting the UC, who he believed was an alien smuggler, via telephone calls that were recorded by law enforcement. NILESH told the UC that he wanted to discuss sending "packages" into the United States. Based on my training and experience, when NILESH discussed sending "packages" to the United States, he was referring to smuggling aliens. On September 25, 2013, the UC and NILESH agreed to set up an in-person meeting in Bangkok, Thailand, to further discuss the matter.

6.  On April 4, 2014, the UC met with NILESH and HARRY in Bangkok, Thailand. The meeting was recorded by law enforcement. HARRY stated that that they have some "girls" they were looking to get to the United States. NILESH stated he had two "girls", approximately 20-years-old, that he wanted to move first. NILESH added that there are many others that he would like to move into the United States after moving the first two "girls". Based on my training and experience, when NILESH and HARRY discussed "moving" aliens, they were referring to smuggling aliens into the United States. The UC told NILESH and HARRY that the cost would be $40,000 per person to smuggle them from Bangkok to the United States. NILESH and HARRY agreed to wire a $10,000 down payment for each individual and that the remaining smuggling fee would be paid when the aliens were picked up in the United States. The UC explained to NILESH and HARRY that because this was an illegal business, it would take some time to set up the move. The UC further explained that the paperwork accompanying the aliens would be fake and that their passports would not be stamped. NILESH and HARRY requested a price concession from the UC to $35,000 per individual. The UC agreed, with the understanding that the price would be higher for future individuals.

7.  On May 21, 2014, NILESH contacted the UC via email and attached passport copies for eight Indian nationals that he wished to have potentially smuggled into the United States.

8.  On June 18, 2014, the UC spoke to NILESH via a telephone call that was recorded by law enforcement. The UC informed NILESH that there would be space to move four aliens the following month and that NILESH should send an email with the information regarding the aliens he wished to move.

9.  On June 20, 2014, NILESH contacted the UC via email and attached passport copies for four Indian nationals that NILESH sought to have potentially smuggled into the United States.

10. On June 28, 2014, the UC spoke to NILESH and HARRY via a telephone call that was recorded by law enforcement. The UC told NILESH and HARRY that he would only be able to move two packages on the trip. NILESH indicated that he understood and told the UC that he would send a revised email with the information for the two aliens to be moved. The UC further told NILESH and HARRY that a $10,000 down payment would be required for each individual once the UC arrived in Thailand. A further $10,000 payment per individual would be required once the aliens arrived in the United States.

11. On July 21, 2014, the UC met with NILESH and HARRY in Bangkok, Thailand, to discuss the upcoming plan to smuggle two Indian nationals into the United States. The meeting was recorded by law enforcement. The UC explained that the aliens would arrive into Philadelphia and be driven north into New Jersey. Alternatively, the UC explained that it was possible that they would fly directly into Newark, New Jersey or Queens, New York. In any event, the UC explained that the aliens would end up at a location in Newark, New Jersey where they could be picked up.

12. On July 23, 2014, the UC met with NILESH and HARRY in Bangkok, Thailand to finalize the details of the upcoming alien smuggling operation. The meeting was recorded by law enforcement. The UC confirmed to NILESH and HARRY that the aliens would be smuggled into the United States on July 24, 2014.

13. On July 24, 2014, NILESH and HARRY brought two Indian nationals ("Individual A" and "Individual B") to the Suvarnabhumi International Airport in Bangkok, Thailand, so that they could be smuggled into the United States in furtherance of the conspiracy. The meeting was recorded by law enforcement. At this time, NILESH and HARRY handed the UC an envelope containing $5,000 in United States currency. NILESH told the UC that an additional $5,000 would be in the UC's bank account by the time the aliens arrived in the United States. Individual A and Individual B were then accompanied by the UC to the gate for boarding and subsequent travel to the United States. The two aliens and the UC were under surveillance by federal law enforcement agents during their travel. Later that day, the two aliens and the UC arrived at Newark Liberty International Airport where they were admitted into the United States and taken to a local hotel by undercover federal law enforcement agents. Individual A and Individual B had no lawful status to enter or remain in the United States.

14. Once at the hotel, the UC engaged in multiple telephone calls with NILESH and an individual who claimed to be the "Uncle" of Individual A and Individual B. Shortly thereafter, the "Uncle" arrived at the hotel and gave the UC $5,000 in United States currency. At that point, the aliens were released to the "Uncle". Additional payments were made by NILESH and HARRY over the ensuing days to cover $69,603 of the $70,000 total smuggling fee.

The Second Alien Smuggling Operation

15. On August 24, 2014, NILESH contacted the UC via email and attached passport copies for four Indian nationals that NILESH sought to have potentially smuggled into the United States.

16. On September 29, 2014, the UC and another undercover law enforcement agent met with NILESH and HARRY in Bangkok, Thailand, regarding the upcoming smuggling of Indian nationals into the United States. The meeting was recorded by law enforcement. During this meeting, the UC told NILESH and HARRY that the aliens would be arriving into the New York City area. The UC also confirmed that the aliens would be smuggled to the United States in the next two or three days. NILESH stated that he would have someone ready to pick them up and that they would make a down payment of $10,000 for each individual before they left Thailand.

17. On October 1, 2014, the UC and another undercover law enforcement agent met with NILESH and HARRY in Bangkok, Thailand, to finalize the details regarding the upcoming smuggling of Indian nationals into the United States. The meeting was recorded by law enforcement. During this meeting, the UC confirmed that the aliens would be arriving into Newark Liberty International Airport. The UC also confirmed that the price for smuggling the aliens would be $45,000 per individual. NILESH agreed to the price so long as the price would be same for the next group of individuals to be smuggled into the United States.

18. On October 2, 2014, NILESH brought two Indian nationals ("Individual C" and "Individual D") to Suvarnabhumi International Airport in Bangkok, Thailand so that they could be smuggled into the United States by the UC. The meeting was recorded by law enforcement. At this time, NILESH and HARRY handed the UC an envelope containing $9,000 in United States currency. NILESH told UC 1 that an additional $1,000 would be in the UC's bank account by the time the aliens arrived in the United States. Individual 3 and Individual 4 were then accompanied by the UC to the gate for boarding and subsequent travel to the United States. The two aliens and the UC were under surveillance by federal law enforcement agents during their travel. Later that day, the two aliens and the UC arrived at Newark Liberty International Airport where they were admitted into the United States and taken to a local hotel by undercover federal law enforcement agents. Individual C and Individual D had no lawful status to enter or remain in the United States.

19. On October 2, 2014, after a down payment for the smuggling fees had been made by NILESH and HARRY, Individual C and Individual D were picked up at the hotel by a person purporting to be a family member. Additional payments were made by NILESH and HARRY over the ensuing days to cover the $90,000 total smuggling fee.

The Third Alien Smuggling Operation

20. On December 9, 2014, NILESH contacted the UC via email and attached passport copies for four Indian nationals that NILESH sought to have potentially smuggled into the United States.

21. On January 20, 2015, the UC met with NILESH in Bangkok, Thailand regarding the upcoming smuggling of Indian nationals into the United States. The meeting was recorded by law enforcement. The UC explained that the price for smuggling the aliens had increased to $50,000 per individual due to increased costs. NILESH indicated that he understood the increased price. NILESH provided the passports for the two aliens that would be smuggled to the United States on this trip. NILESH and the UC then discussed the risks they were running by engaging in this illegal operation. NILESH further stated that he had been smuggling people into the United States since 1998.

22. On January 21, 2015, the UC met with NILESH in Bangkok, Thailand to finalize the details of the upcoming alien smuggling operation. The meeting was recorded by law enforcement. The UC confirmed to NILESH that the aliens would be smuggled into New Jersey the next day.

23. On January 22, 2015, NILESH brought two Indian nationals ("Individual E" and "Individual F") to Suvarnabhumi International Airport in Bangkok, Thailand, so that they could be smuggled into the United States by the UC. Individual E and Individual F were accompanied by the UC to the gate for boarding and subsequent travel to the United States. The two aliens and the UC were under surveillance by federal law enforcement agents during their travel. Later that day, the two aliens and the UC arrived at Newark Liberty International Airport where they were admitted into the United States and taken to a local hotel by undercover federal law enforcement agents. Individual E and Individual F had no lawful status to enter or remain in the United States.

24. On January 22, 2015, after a down payment for the smuggling fees had been made by NILESH, Individual E and Individual F were picked up at the hotel by a person working with NILESH. Additional payments were made by NILESH over the ensuing days to cover the $100,000 total smuggling fee.